UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| GOTOIMOANA SUMMERS, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) CAUSE NO. 3:15-CV-118-PPS-MGG ) |
| CAROLYN COLVIN, Acting Commissioner of the Social Security Administration, | ) ) ) ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Gotoimoana Summers appeals the Social Security Administration's decision to deny her application for disability insurance benefits. An administrative law judge found that Summers was not disabled within the meaning of the Social Security Act. Summers raises a number of challenges to this determination, but I conclude that the ALJ's decision was supported by substantial evidence. The decision of the ALJ, therefore, will be affirmed.

**Background**

Summers was 51 years old at the time of her hearing. [DE 13 at 54.][1] She was 5'5" and weighed 289 pounds. [*Id.*] She was unemployed, using her husband's insurance, and did not have a driver's license. [*Id.* at 55-56.] She testified that she completed the 12th grade, but required special education to do so. [*Id.* at 56-57.] Prior

---

[1] The administrative record is found in the court record at docket entry 13, and consists of 583 pages. I will cite to its pages according to the court's Electronic Case Filing page number, rather than by the Social Security Administration's Bates stamp numbers, which don't begin until page 6 of 583 as the pages are enumerated in ECF.

to her claim of disability, Summers had a 15 year record of consistent work as a production line worker, assembler, packager, and injection mold operator. [*Id.* at 73-74.] Most recently she worked at Elkhart Product, where she worked from 2005, as an assembler. [*Id.* at 59.] At the hearing, she initially told the ALJ that the last day she worked was February 24, 2012 and that she stopped working because she had health issues and was hospitalized for three days, but upon questioning by the ALJ, Summers admitted that she actually was fired. [*Id.* at 58.]

A little more than a month after losing her job at Elkhart Product, on March 22, 2012, Summers filed an application for disability benefits. Summers alleged an onset date of February 24, 2012, the same date she was fired from her job. After a hearing before an ALJ, Summers' claim was denied.

At the hearing, Summers testified along with a vocational expert. Summers has a number of medical problems that she is dealing with. Summers told the ALJ that she has a problem with her lungs and has problems breathing and gets light headaches and sometimes experiences dizziness and black outs. [*Id.* at 63-64.] She later said that she gets anxiety attacks when she has trouble breathing and her lungs close and that if she hasn't had enough oxygen, she gets really bad headaches, migraines, and dizziness, sometimes just passing out. [*Id.* at 67-68.] She said she has migraines and that she takes Tylenol for them. [*Id.* at 68.] Summers also told the ALJ that she was taking "heart pills . . . stress pills, depression – blood thinner medication . . use[s] [her] nebulizer inhaler" twice a day, and uses oxygen at night. [*Id.* at 64-65.] At the hearing, Summers was

using a cane and said that a doctor prescribed it to her because she was having trouble walking around the store and standing when she was trying to pick something up. [*Id.* at 68-69.] Specifically, she said that her legs are swollen and she has trouble walking. [*Id.* at 69.]

The ALJ issued a decision denying benefits. [DE 13 at 25-42.] At Step One, the ALJ found that Summers met the insured status requirements of the Social Security Act, and that she has not engaged in substantial gainful activity since February 24, 2012, the alleged onset date. [*Id.* at 27.] At Step Two, the ALJ concluded that Summers suffered from obesity, an irregular heartbeat, chronic obstructive pulmonary disease, asthma, sleep apnea, anxiety, and depression. [*Id.* at 28.] At Step Three, the ALJ determined that these various impairments did not meet or medically equal the severity of one of the listed impairments. [*Id.* at 28.]

Next, the ALJ found that Summers has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b). Here is Summers' RFC as determined by the ALJ:

> lifting, carrying, pushing and pulling up to 20 pounds occasionally and up to ten pounds frequently; standing and/or walking (with normal breaks) for approximately six hours per eight-hour workday; sitting (with normal breaks) for approximately six hours per eight-hour workday; occasional climbing of ramps and stairs, never climbing ladders, ropes, or scaffolds; occasional balancing, stooping, crouching, kneeling, and crawling; and, should avoid concentrated exposure to extreme cold, extreme heat, humidity, and irritants such as fumes, odors, dust and gases, poorly ventilated areas, and chemicals. The claimant is limited to work in a low stress job,

> defined as requiring only occasional decision making and only occasional changes in the work setting. The claimant is limited to superficial interaction with coworkers, supervisors, and the public, with superficial interaction defined as occasional and casual contact not involving prolonged conversation or discussion of involved issues. Contact with supervisors still involves necessary instruction. The claimant is unable to engage in complex or detailed tasks, but can perform simple, routine, and repetitive tasks consistent with unskilled work, and she is able to sustain and attend to task throughout the workday.

[*Id.* at 31.] Given this RFC, and based on the testimony of a vocational expert, the ALJ concluded that Summers is capable of performing past relevant work as an assembler and, in the alternative, concluded that there are other jobs that exist in significant numbers in the national economy that Summers also can perform. [*Id.* at 41-42.]

## **Discussion**

Summers makes five arguments as to how the ALJ erred, and I will evaluate each of them below, but in doing so I must keep in mind that judicial review of the Commissioner's decision is limited. If an ALJ's findings of fact are supported by "substantial evidence," then they must be sustained. *See* 42 U.S.C. § 405(g); *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). In making a substantial evidence determination, I must review the record as a whole, but I can't re-weigh the evidence or substitute my judgment for that of the ALJ. *Id.*

Summers first objects to the RFC determination because the ALJ did not include a limitation to work that avoided exposure to machines, tools and sharp objects. The argument goes that because Summers is on anti-coagulation medications, if she were

4

punctured at work, she would be a substantial bleeding risk. [DE 25 at 21-24.] Summers claims that her past relevant work as an assembler, which the ALJ found she was capable of doing, would expose her to "machines, tools, sharp objects etc." and that "[t]he failure to include the limiting effects of this impairment in a hypothetical and the consequent RFC requires remand." [*Id.* at 23.]

Summers' argument is unpersuasive and lacks any basis in the evidence. In making her determination, the ALJ relied upon all of the evidence of record including Summers' testimony, the opinions of examining and reviewing doctors, and the clinical evidence. The record was devoid of any evidence to support Summers' assertion that her drug regimen places her at risk of severe bleeding episodes. Indeed, the evidence is to the contrary. In November 2012, the state medical consultant—Dr. Whitley—opined that Summers had the RFC to tolerate <u>unlimited exposure</u> to hazards such as machinery and heights. [DE 13 at 358.] The ALJ ultimately agreed with Dr. Whitley that the evidence did not support additional limitations for hazards [DE 30 at 5], but she nonetheless took a more conservative route when she determined that Summers should have a more restrictive RFC than the medium exertional level outlined in Dr. Whitley's opinion. In support of her argument, Summers offers nothing more than a listing of her medications and citations to websites describing their side effects. [DE 25 at. 22.] But there is no *evidence*, either clinical or opinion, that the side effects of Summers' medication would further restrict her RFC.

Summers argues that the ALJ's failure to include a limitation to work that avoided certain hazards due to potential side effects of Summers' anti-coagulation medication is an example of the ALJ's failure to fully and fairly develop the record. But it is Summers' burden to prove that her impairment (or in this case that the medications taken to treat it) rendered her functionally limited. *See* 20 C.F.R. § 404.1512. It is the claimant's responsibility to "inform [the Social Security Administration] about or submit all evidence known to [the claimant] that relates to whether or not [the claimant is] . . . disabled." 20 C.F.R. § 404.1512(c). Before it makes a determination that a claimant is not disabled, it is the Social Security Administration's responsibility to develop the claimant's medical history for at least 12 months preceding the month in which she filed her application and it must make every reasonable effort to help her get medical reports from the claimant's medical sources when the claimant gives the Social Security Administration permission to request the reports. 20 C.F.R. § 404.1512(d). The Social Security Administration may ask a claimant to attend one or more consultative examinations, but only after the Administration has "made every reasonable effort to obtain evidence from [the claimant's] medical sources." 20 C.F.R. § 404.1512(e).

Summers neglects to identify any evidence that was missing from the records or explain how the record was incomplete. And while reasonable minds may differ as to what constitutes a complete record, it is the ALJ who decides how much evidence is enough and it is not for me to question what appears to be a reasonable assessment of the evidence. *See Kendrick v. Shalala*, 998 F.2d 455, 457 (7th Cir. 1993) ("Concern for the

need to get on with today's cases today and reach tomorrow's cases tomorrow, rather than next month, suggests that the federal judiciary accept reasonable assessments by administrative officials about how much evidence is enough."). Summers' argument, therefore, must fail because there is no indication that the record was not fully developed and there is no evidence in the record that the side effects of Summers' medications would further restrict her RFC.

Summers' second argument is that the ALJ failed to adequately develop the record in relation to Summers' testimony that she had "bad days" or "absences" pertinent to chronic ear infections, chronic sinusitis, chronic allergic rhinitis, and depression. [DE 25 at 18.] During Summers' hearing, the ALJ asked her to tell her "what your typical day is like" and Summers answered that "[s]ometimes, I have bad days. Sometimes, I don't think. Sometimes, I get depressed." [DE 13 at 69.] The ALJ then asked Summers' counsel if he had any questions for Summers. [*Id.*]

Summers argues that remand is required because the ALJ did not ask any follow up questions to Summers' description of her days. [DE 25 at 25.] For starters, as I have already discussed, while the ALJ has a duty to develop the record, the burden to prove the disability is on the claimant. Nonetheless, the hearing transcript reflects that the ALJ probed Summers about each of her impairments, providing her ample opportunity to justify her claims of total disability. The ALJ asked Summers about her fears of getting a driver's license because of her health [DE 13 at 56], about the circumstances surrounding her trip to the hospital on her alleged onset date [*id.* at 58], and about all of

the reasons she claimed she was unable to work [*id.* at 63-64]. The ALJ also heard testimony regarding Summers' lung and breathing issues [*id.* at 63-65, 67], her dizziness and blackouts [*id.*], the medications she is taking and their side effects [*id.* at 64-65], her depression [*id.*], her pain [*id.* at 67], her use of a cane and trouble walking [*id.* at 68-69], and her problems sitting [*id.* at 69]. Prior to concluding her examination of Summers, the ALJ even asked if there are "[a]ny other physical problems or symptoms?" [*Id.* at 68.]

What's more, immediately after Summers gave her "bad days" answer, the ALJ turned the questioning over to Summers' attorney, who then had the opportunity to further developed the record on that issue to the extent he saw necessary. *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007) ("[A] claimant represented by counsel is presumed to have made his best case before the ALJ"). As I discussed above, I must accept a reasonable assessment by the ALJ about how much evidence is enough. *Kendrick*, 998 F.2d at 457. The record before the ALJ, including her own thorough examination of Summers, was sufficient for her to make a reasonable decision regarding the intensity, persistence, or functionally limiting effects of pain or other symptoms and the ALJ was not unreasonable for not inquiring further regarding Summers' statement about her "bad days."

In addition, the ALJ was inquiring and evaluating Summers' subjective symptoms against a backdrop of inconsistent statements and unsupported allegations that ultimately resulted in the ALJ determining that Summers' "statements concerning

8

the intensity, persistence and limiting effects of these symptoms are not entirely credible." [DE 13 at 32.] The ALJ's credibility determinations are entitled to deference because the ALJ is "in a special position to hear, see, and assess witnesses." *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014). A credibility determination will be upheld as long as it is explained in a way that allows the court to determine that the ALJ logically based the determination of specific findings and record evidence. *Id.*

In this case, the ALJ provided a logical explanation for the credibility determination: the medical evidence contradicted many of Summers' assertions about physical and mental difficulties, many of which were inconsistent. [DE 13 at 32-35.] For the sake of brevity, I will only give a few examples. In her opinion, the ALJ noted that at the hearing, Summers testified that she was no longer drinking alcohol and that she had never smoked marijuana, but changed her story when confronted with conflicting statements that she made to healthcare providers. [DE 13 at 33.] The ALJ also noted that Summers made similar inconsistent statements to healthcare providers regarding her smoking history. [DE 13 at 33.] The ALJ's opinion also highlights inconsistencies in Summers' reports regarding the circumstance under which she stopped working, with Summers initially testifying at the hearing that she stopped working due to "health issues" but later admitting, when confronted with records to the contrary, that she was actually fired. [*Id.* at 33.] Finally, the ALJ's opinion highlights several significant inconsistencies between Summers' testimony regarding her symptoms and the record medical evidence. [*Id.* at 33-34.] From all of these inconsistencies, the ALJ reasonably

9

concluded that Summers' statements could not be taken as the absolute truth and potentially informed her determination regarding whether to inquire further into Summers' symptoms. For these reasons, I cannot say that it was unreasonable for the ALJ to choose not to investigate any further into Summers' statements regarding her "bad days" and potentially resultant absences.

And in all events, this second issue strikes me as much ado about nothing. It seems pretty evident that Summers' testimony about having "bad days" was reasonably taken by the ALJ as a colloquial way of saying she was suffering from some depression. We know this because immediately following her testimony about having "bad days" Summers' elaborated by saying, "Sometimes, I get depressed." [DE 13 at 69.] And the depression issue was certainly not lost on the ALJ; she considered and acknowledged Summers' depression in her opinion. [*Id.* at 32.] For all of these reasons, I am unpersuaded by Summers' second argument.

Next, Summers argues that the ALJ failed to adequately take into account her morbid obesity. [DE 25 at 25-27.] But, in fact, throughout her opinion, the ALJ *did* acknowledge Summers' obesity and considered it as a factor when assessing the RFC. The ALJ included obesity as one of Summers' severe impairments and, in her discussion of the RFC, explained that she had "considered all symptoms to the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." [DE 13 at 28, 31.] Specifically, the ALJ noted that "[o]besity has been implicated in terms of respiratory problems and sleep apnea,"

[*Id.* at 37 (internal citations omitted)], that "[a]t five feet two inches tall, the claimant has weighed more than 270 pounds since the alleged onset date, with the highest recorded weight being 294 pounds . . . represent[ing] body mass indices ("BMI") between 49.4 and 53.8" [*id.*], as well as the history of doctors' advice to exercise, eat healthier, and lose weight [*id.*]. The ALJ's analysis of Summers' RFC explicitly factored in the contribution from Summers' obesity while also noting that Summers reported that she was in good general health on her alleged onset date and was at a similar weight during the period of time in which she was working. [*Id.*] The ALJ also noted that while obesity is "extreme," it did not preclude Summers from sustaining work activity in the past. [*Id.*]

Taking all of this into consideration, along with the rest of the record, to determine the aggregate impact of Summers' impairments, the ALJ found that "the record is sufficient to establish that the claimant's impairments preclude her from performing work at the medium exertional level on a continuing basis," and noted that "the level of obesity alone would likely result in decreased stamina that would make work at [the medium exertional level on a continuing basis] a challenge." [*Id.* at 38.] In addition, she precluded extreme climbing and limited performance of other postural maneuvers to "occasional" and said that "[t]hese limitations account for periods of shortness of breath, and they recognize mobility challenges that likely arise from obesity" and noted that "[l]imiting the claimant to work at the light exertional level is also prudent in order to avoid excess exertion that may trigger palpitations or shortness

11

of breath due to COPD and/or asthma." [*Id*.] I am persuaded that the ALJ properly considered Summers' obesity and its impact in evaluating her claim of disability.

Next, Summers argues that the ALJ erred by failing to award at least a "period of disability." [DE 25 at 27-29.] An award of temporary benefits can be granted if a claimant meets the Social Security Act's definition of "disability" for a time lasting 12 months or longer, even if she later recovers sufficient health to return to full-time work on a long term basis. Summers bears the burden of showing that she has been unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The inability to engage in any substantial gainful activity, and not merely the impairment itself, must last for at least twelve months. *Barnhart v. Walton*, 535 U.S. 212, 216-22 (2002); *see also Lambright v. Colvin*, No. 1:12-CV-138, 2013 WL 1403221, at *10 (N.D. Ind. Apr. 5, 2013) (addressing identical argument).

Summers asks "on what plausible basis could the ALJ possibly have concluded there has been no period lasting 12 months or more in which she did not meet the definition of disability under the regulations," but points me to no evidence of a 12 month span in which her impairments rendered her disabled under the law. Summers asserts that the ALJ should have found her disabled for a closed period of disability that started at the alleged onset date of February 24, 2012 through at least May 21, 2013, when she had cardiac catheterization and required stabilization from an episode of

12

supraventricular tachycardia. The ALJ discussed cardiac examinations during this period of time, however, including those from February, June, and September 2012, which showed mostly benign results and that Summers' cardiac condition was controlled when she took her medication as prescribed. [DE 13 at 35.] Indeed, it appears that her respiratory functioning actually was *improving* during this time, as there was a moderately severe obstruction in July 2012 and May 2012, but by November 2012 a study showed that Summers had improved.

In sum, the ALJ's conclusion that Summers was not disabled during this time is supported by the evidence highlighted in her opinion. And even if reasonable minds could differ concerning whether Summers was disabled, I must defer to the ALJ's decision so long as it is adequately supported, as it is in this case. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

Finally, Summers argues that the ALJ failed to consider Summers' consistent and arduous work history in determining Plaintiff's credibility. [DE 25 at 29-30.] Summers argues that her past good work record proves that she is credible when she now claims an inability to work because of disability. [DE 25 at 30.] But there is no controlling precedent to support such a broad proposition, and it is not one of the factors listed in 20 C.F.R. § 404.1529(c)(3) that the ALJ must assess during her subjective symptoms evaluation . More to the point, as discussed above, the record is replete with inconsistent statements and unsupported allegations, which the ALJ addressed at length in her opinion. [DE 13 at 32-35.] From all of this, the ALJ reasonably concluded

that Summers' statements could not be taken as absolute truth. Accordingly, the ALJ's credibility determination was not patently wrong.

## Conclusion

Summers fails altogether to demonstrate that the ALJ's findings and conclusions about the severity of her impairments and her residual functional capacity are not supported by substantial evidence. Using the applicable deferential standard of review, I conclude that the ALJ's determinations were supported by relevant evidence such as a reasonable mind might accept as adequate to support her conclusions. *Moore*, 743 F.3d at 1120-21.

ACCORDINGLY:

The final decision of the Commissioner of Social Security denying plaintiff Gotoimoana Summers application for a period of disability and disability insurance benefits is AFFIRMED.

The Clerk shall enter judgment in favor of defendant and against plaintiff.

**SO ORDERED**.

ENTERED: September 7, 2016

  s/ Philip P. Simon
**PHILIP P. SIMON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**